**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**


**NICHOLAS SERVICES, LLC d/b/a NICHOLAS
AIR and CORR AVIATION, INC.**                              **PLAINTIFFS**


**V.**                                                   **NO. 3:23CV251 MPM-RP**


**BOMBARDIER INC. and BOMBARDIER
AEROSPACE CORPORATION**                                   **DEFENDANTS**


**<u>ORDER</u>**

This cause comes before the court on the motion of defendants Bombardier, Inc. (BI) and

Bombardier Aerospace Corporation (BAC) to dismiss this action for lack of personal

jurisdiction, or, alternatively to compel arbitration.[1]  This court also has before it a motion for

preliminary injunction filed by plaintiffs Nicholas Air and Corr Aviation, Inc.

In their preliminary injunction motion, plaintiffs note that defendant BI has proceeded to

arbitration of the claims against it before the American Arbitration Association (AAA) without

first waiting for a ruling from this court on its motion to compel arbitration.  The arbitrator

appears to have made at least a preliminary determination that plaintiffs' claims are arbitrable

and has therefore elected to proceed with arbitration.  In light of this determination, plaintiffs

seek for this court to enjoin defendant, and the arbitrator, from continuing this arbitration until

---

[1] In their brief, defendants describe themselves as follows:

> Defendant BI is a Canadian corporation with a principal place of business in Québec,
> Canada. BI is one of the largest business aircraft manufacturers and sellers in the world
> and operates out of facilities in Québec and Ontario.  BAC is a Delaware corporation
> with its principal place of business in Kansas.  BAC is an indirect subsidiary of BI and is
> engaged in the business of selling BI-manufactured aircraft.

[Brief at 3].

this court rules on the motion to compel arbitration before it. Plaintiffs agree, however, that this preliminary injunction motion will become moot once this court rules on the motion to compel arbitration, and, that being the case, prioritizing the latter motion makes far more sense to this court. Indeed, it is unclear to this court why it should make *preliminary* findings regarding how it will most likely rule upon the arbitration motion in this case, when that motion is fully briefed and, as such, it can simply rule upon it. This court does agree with plaintiffs, however, that defendant's rather aggressive decision to proceed immediately to arbitration has created considerable urgency to rule on the motion to compel arbitration quickly, which it has endeavored to do in this order.

Before addressing the jurisdictional and arbitration issues in this case, this court will briefly describe the nature of the dispute between the parties. This is, *inter alia*, a breach of warranty action arising out of allegations by plaintiffs that Bombardier, a Canadian aircraft manufacturer, failed to live up to the terms of warranty agreements covering two Bombardier aircraft which were initially sold to Brazilian and Californian companies and later resold, with the warranties intact, to Nicholas. [Defendant's brief at 2]. In their complaint, plaintiffs allege that:

> 8. Nicholas Air provides private air travel services and owns a fleet of aircraft for that purpose.
> 9. Corr Aviation is a part 145 maintenance, repair, and overhaul station ("MRO") that Nicholas Air utilizes for aircraft maintenance support and services.
> 10. In 2022, Nicholas Air purchased two Challenger 350 aircraft manufactured by Defendants. The two aircraft bear serial numbers 20860 ("Aircraft 1") and 20833 ("Aircraft 2").
> 11. Defendants Bombardier Inc. and BAC (collectively, "Bombardier") warrantied these Challenger aircraft for 5,000 flight hours or 60 months from delivery, whichever comes first
> ("the Warranty" or "the Warranties").
> 12. The Warranties cover the repair, replacement, or rework of defects, and provide that Bombardier is responsible for the cost of parts, material, and labor.
> 13. The Warranties are fully transferable and follow the title to the covered aircraft.

[Complaint at 1].

In their complaint, plaintiffs allege that both aircraft developed serious mechanical issues as to which they made claims under the Warranty. Moreover, while plaintiffs acknowledge that technicians were sent to repair the aircraft, they assert that defendants repeatedly fell short of their obligations under the Warranty, such as by demanding that Nicholas pay for the travel and living expenses of Bombardier's technicians. [Complaint at 4]. In their complaint, plaintiffs list many such instances in which, they contend, Bombardier fell short of its obligations under the Warranty, and they assert that, to keep its airplanes and business running, Nicholas was repeatedly required to obtain the services of third party vendors or technicians, such as its co-plaintiff Corr, to perform tasks which should have been performed by defendants under the Warranty. [Complaint at 5-9]. This court notes that, in its arbitration demand, Bombardier provides a very different description of the warranty dispute in this case, describing Nicholas as having "a history of repeatedly defaulting on payments owed" and describing itself as having gone the extra mile to provide services above and beyond those required by the Warranty. [Arbitration demand at 1-2].

Having noted the basic dispute in this case, this court will now address the jurisdictional and arbitration issues herein. Given the time limitations and urgency referenced above, this court will frequently adopt the arguments of one side or the other when it finds them fully persuasive and supplement them with its own findings when necessary. As always, this court considers jurisdictional issues first, and, in doing so, it will first note the legal principles which apply in this context. It is well-settled that the party who attempts to invoke the jurisdiction of the Court bears the burden of establishing a *prima facie* case of personal jurisdiction over each defendant. *D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 545 (5th Cir.

1985); *Lofton v. Turbine Design, Inc.,* 100 F. Supp. 2d 404, 407 (N.D. Miss. 2000). Personal

jurisdiction over a defendant can be exercised to the same extent that a state court in this forum

could. The reach of such jurisdiction is limited by the state's applicable long-arm statute as well

as the due process requirements of the Fourteenth Amendment. *Tellus Operating Group, LLC v.*

*R & D Pipe Company,* 377 F. Supp. 2d 604, 606 (S.D. Miss. 2005) (internal citation omitted).

Under these due process requirements, the contacts with the forum state "must be such that

maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980). The plaintiff must show

that defendant "purposefully avail[ed] [themselves] of the privilege of conducting activities

within [Mississippi], thus invoking the benefits and protections of its laws." *Asahi Metal Indus.*

*Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987) (citation omitted).

     In order for a Mississippi court to exercise personal jurisdiction over a non-resident

defendant, the plaintiff must first demonstrate that the defendant falls within one of the three

prongs of the Mississippi long-arm statute. *Yatham v. Young,* 912 So. 2d 467 (Miss. 2005). These

include the "doing business," "contract," and "tort" prongs of the state's long-arm statute. Miss.

Code Ann. § 13-3-57 (2007). After the plaintiff makes this initial showing, he must then

demonstrate that an exercise of personal jurisdiction would be permissible under the Fourteenth

Amendment of the United States Constitution. *Allred v. Moore & Peterson,* 117 F.3d 278, 281

(5th Cir. 1997), cert. denied, 522 U.S. 1048 (1998). Mississippi's Long-Arm Statute is not

coextensive with federal due process, and an analysis of the scope of the statute is thus required

when a defendant challenges the court's exercise of personal jurisdiction. *Allred,* 177 F.3d at 282.

     In addressing defendants' motion, this court finds itself in agreement with plaintiffs'

well-reasoned arguments in their extensive briefing on the personal jurisdiction issue, although,

as discussed below, it believes that further elaboration on certain points is appropriate. This court further notes that defendants had the last word on these personal jurisdiction issues in their reply brief, but it regards their attempts to rebut plaintiff's personal jurisdiction arguments as frequently being less than persuasive. This applies to Bombardier's attempts to distance itself from its own website, which, as plaintiffs note in their brief, lists five representatives assigned to serve Mississippi.[2] Plaintiffs argue, and this court agrees, that assigning five agents to handle customers in this state represents a purposeful effort by defendants to avail themselves of the Mississippi marketplace, in such a manner as to support a finding of personal jurisdiction over them.

In seeking to rebut this evidence, defendants rely upon an affidavit from BAC's corporate secretary Aaron Disney, who states in that document that:

> 6. The website identifies customer service employees who are responsible for various geographic regions around the world. Five individuals list Mississippi as part of their territory. Those individuals are: Steve Commodore, Ryan Davila, Scott Fortmann, Mike Townsend, and Paul Yovich.
> 7. The place of employment of those individuals is as follows:
> a. Steve Commodore is employed by BAC and is based in Texas.
> b. Ryan Davila is employed by Learjet and is based in Texas.
> c. Scott Fortmann is employed by Learjet and is based in Oklahoma.
> d. Mike Townsend is employed by Learjet and is based in Kansas.
> e. Paul Yovich is employed by Learjet and is based in Florida.

[Disney affidavit at 2].

Mr. Disney thus attempts to minimize the contacts of four of these five agents by characterizing them as "Learjet" employees. However, this court notes that Bombardier's website states that "[t]he Learjet Corporation acquisition in 1990 allowed Bombardier to launch

---

[2] See Bombardier Business Aircraft Customer Services, available at https://businessaircraft.bombardier.com/en/contacts/customer-services

the Learjet 60, which would soon become the top-selling aircraft in its class,"[3] and it thus appears that Learjet is owned by Bombardier. This court further notes that companies are generally not in the habit of providing customer service for other companies' products on their website, which raises serious skepticism in its mind regarding Bombardier's attempts to distance itself from Learjet.

This court further notes that, regardless of the exact corporate relationship between Bombardier and Learjet, Bombardier's website describes each of the five Mississippi representatives on its website as being responsible for customer relations with regard to "Learjet, Challenger [and] Global" aircraft. *Id.* The latter two are airplane models manufactured and sold by *Bombardier*, not Learjet, as evidenced by the fact that, in this case, Nicholas purchased Challenger 350 models.[4] It thus seems clear to this court that, regardless of which company signs the paychecks of four of the five employees in question, they are in the business of performing sales and customer support services for Bombardier. This court therefore looks with considerable skepticism upon Bombardier's attempts to distance itself from these employees, and, once again, Disney himself concedes that Steve Commodore is an employee of defendant BAC.

In their brief, plaintiffs describe just how active Bombardier agents were in marketing their airplanes not only to Mississippians in general, but to them in particular. For example, plaintiffs write in their brief that:

> Bombardier visited Plaintiffs in person in Oxford, Mississippi at least twice. On July 15, 2019, soon after Nicholas Air's purchase of its first Bombardier jet, Henry Yandle, Bombardier's Sales Director for Corporate Fleets, emailed the CEO of Nicholas Air to introduce himself. (Introductory Email, attached as Exhibit 16). In his email, he explained that "Bombardier has elected to build a team primarily focused [on] building and

---

[3] https://bombardier.com/en/who-we-are/our-history
[4] https://businessaircraft.bombardier.com/en/aircraft

maintaining relationships with large fleet operators such as Nicholas Air." (*Id.*). He went on to state, "I will be in Mississippi during the week of July 23rd. I am wondering if you have time next week for me to drop in and hand you a business card." (*Id.*). During his time in Mississippi, Mr. Yandle in fact met with Nicholas Air's Director of Maintenance on July 24, 2019. (*See* Post-Meeting Email, attached as Exhibit 17).

A few months later, on December 11, 2019, two Bombardier representatives – Mr. Yandle, and Cal Flannery, Manager of Customer Response – paid another visit Nicholas Air and Corr Aviation in Oxford. (*See* Pre-Visit Emails, attached as Exhibit 18; Post-Visit Email, attached as Exhibit 19). Mr. Flannery and Mr. Yandle met with Nicholas Air representatives, took them to lunch at City Grocery restaurant, toured Corr Aviation's service center, and met with Corr Aviation personnel. (Ex. 18). Following this meeting, Mr. Yandle emailed Nicholas Air's Director of Maintenance a report comparing the Challenger 350 and Citation Latitude. (Ex. 19). Mr. Yandle also asked that Nicholas Air sent him its corporate presentation, saying he "plan[ned] to use this [to] help make argument for Nicholas Air becoming an ASR." (*Id.*) He said he looked forward to "strengthening and expanding the relationship" and to "hosting your team in Montreal." (*Id.*) Mr. Yandle and Mr. Flannery subsequently remained in touch with Plaintiffs as issues arose with the aircraft. (*See, e.g.,* Jun. 9, 2020 Email, attached as Exhibit 20).

[Brief at 9-10].

Later in their brief, plaintiffs write that:

In the years following Mr. Yandle's initial visit to Nicholas Air in Oxford, he continued reaching out to Nicholas Air in sales-related efforts. (*See, e.g.,* Ex. 20; Jul. 2020 Sales Email, attached as Exhibit 22; Oct. 2020 Sales Email, attached as Exhibit 23). Mr. Yandle's outreach also included a personal invitation to Nicholas Air's Director of Maintenance for a "Bombardier Sporting Clay Shoot" to be held October 21, 2019, (Skeet Shoot Invitation, attached as Exhibit 24); when the Director of Maintenance indicated he could not make it to the skeet shoot, Mr. Yandle made plans to buy him lunch that day instead. (Skeet Shoot Lunch Email, attached as Exhibit 25). In August 2021, Mr. Yandle forwarded to Nicholas Air's Director of Maintenance a listing for a Bombardier aircraft for sale, asking, "Did you see this one?" (Aug. 2021 Sales Email, attached as Exhibit 26).

In October 2023, a number of Bombardier personnel worked to make aircraft sales to Nicholas Air. Peter Bromby, Vice President of Sales, communicated by phone and email with Nicholas Air's President about Bombardier's Global 5000 and Global 6000. (*See* Bromby Emails, attached as Exhibit 27). Mr. Bromby obtained details about specific flight routes that were of interest to Nicholas Air, including the home airports involved, the temperature and climate concerns, and number of passengers intended. (*Id.*).

About a week later, Bombardier Sales Director Mark Serbenski sent Nicholas Air two "route studies" – one for the Global 5000 and one for the Global 6000, tailored to the specifications Nicholas Air conveyed to Mr. Bromby. (Serbenski Email, attached as Exhibit 28). Mr. Serbenski noted that both aircraft "can complete the Oxford to London route nonstop at M0.85 from a 100F departure temp in Oxford, provided that the takeoff

is from [Oxford airport] runway 27." (*Id.*) He added, "The route could still be done from runway 09 but you would need to slow down." (*Id.*)

Mr. Serbenski also sent a "range map" specifically drawn for flights out of Oxford, Mississippi, showing what parts of the world could be reached from Oxford via the Global 5000 and the Global 6000, with a 100°F temperature at takeoff. (Range Maps, attached as Exhibit 29). The route studies transmitted by Mr. Serbenski were prepared by Melissa Giannangelo, of Bombardier's Sales Engineering team. (*See* Global 5000 Route Study, attached as Exhibit 30, at 1; Global 6000 Route Study, attached as Exhibit 31, at 1). The cover pages state that they were route studies "From Oxford" and "Prepared for Nicholas Air." (*Id.*) The studies provide analyses for the specific flight routes of interest to Nicholas Air, including (for each route) factors like distance, winds, payload, fuel needs, speed, altitude, and takeoff and landing weights. (*Id.* at 3-6). They even provide the takeoff weights calculated for runway 27 at the Oxford airport, at 100°F.

[Brief at 12-13].

This court regards these as very extensive marketing efforts which were made by Bombardier to establish a business relationship not only with Mississippians in general, but with the plaintiffs in this case in particular. This court further notes that, in a 2021 case, the U.S. Supreme Court found Ford to be subject to personal jurisdiction in Montana partly because "[b]y every means imaginable—among them, billboards, TV and radio spots, print ads, and direct mail—Ford urges Montanans and Minnesotans to buy its vehicles." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct*., 141 S. Ct. 1017, 1025 (2021). It is beyond dispute that repeatedly sending sales agents to Mississippi to "wine and dine" the plaintiffs in this case is a far more aggressive, purposeful and targeted form of marketing than the "billboards, TV" and other similar advertising tools referenced in *Ford*. Moreover, while plaintiffs understandably only have information regarding the sales techniques directed at them, it certainly seems reasonable to assume that the multiple agents responsible for selling Bombardier planes in Mississippi directed similar techniques at other prospective customers in this state.

In their brief, plaintiffs further argue that Bombardier made repeated contacts with them in Mississippi both to enter into contracts and to negotiate possible resolutions once disputes arose regarding the Warranty in this case. For example, plaintiffs argue that:

> Bombardier sought and entered contracts with Mississippi residents. In July 2019, Bombardier executed a Smart Services Program Transfer agreement, consenting to transfer a Smart Services contract to Nicholas Air. (Ex. 2). Specifically, the transfer agreement was executed by Bill Molloy, a VP for Bombardier Inc., and Deborah Creamer, Director of Legal Services for Bombardier Inc. (*Id.*). Upon transfer of the agreement, Bombardier was contractually obligated to provide Nicholas Air components for its aircraft. (*See* Ex. 1, § 3.1). Nicholas Air was obligated, in Mississippi, to abide by the many terms of the original Smart Services agreement, including, for example, requirements to comply with all maintenance requirements dictated by Bombardier (*id.* at § 2.1); to maintain and provide log books for the aircraft including all flight hours, cycles, landings, operating events, modifications, repairs, and maintenance (§ 5.10); to limit the use of the aircraft to passenger-carrying function (§ 5.1.2), and to limit the use of components to an annual average of one cycle per flight hour (§ 5.1.7).
> On October 22, 2020, Alyson Pond, Senior Account Manager for Bombardier Business Aircraft sent Nicholas Air a Bombardier Smart Parts Plus Agreement, created by Bombardier, for a renewal of the prior contract. (Exs. 3, 4). The cover page of the agreement shows that the agreement was created specifically for Nicholas Services, LLC, with the contract number SP- 20286-63. (Ex. 4 at 1). The agreement states that the parties would be Bombardier Inc., in Quebec, and Nicholas Services, LLC, in Columbus, Mississippi. (*Id.* at 3). Under the agreement, Bombardier would provide "comprehensive cost coverage of Components or Component Services ordered from Bombardier[.]" (*Id.*).
> On April 6, 2021, Ms. Pond communicated to Nicholas Air that their contract, "agreement number SP-20286-63,"₇ which had been active, would be officially terminated effective March 11, 2021 at Nicholas Air's request. (Ex. 6).
> On or about March 18, 2022, the warranty for Aircraft 20860/633N transferred to Nicholas Air, establishing a contract between it, a Mississippi company, and Bombardier. (*See* Ex. 10). On or about September 15, 2022, the warranty for Aircraft 20833/623N transferred to Nicholas Air, establishing another contract between the entities. (*See* Ex. 11). Each warranty requires Nicholas Air, in Mississippi, to (among other things) notify Bombardier within ninety days of discovering a warranty-covered defect, to ship the defective component to Bombardier, and to maintain reasonably complete records of the operation and maintenance of the aircraft, which it is to make available to Bombardier. (Dkt. 25-2 at 38-39, §§ 7.1, 7.12).
> On March 22, 2023, Bombardier sent Nicholas Air a proposed settlement agreement, to settle a number of legitimately disputed invoices. (Ex. 8). As previously stated, Nicholas Air disputed these invoices as Bombardier unfairly sought payment for repetitive repairs for the same defect, which recurred immediately or almost immediately after Bombardier allegedly fixed the issue. (Ex. 5). After Nicholas Air countered on April 6, 2023, (Apr. 6, 2023 Letter, attached as Exhibit 21), Bombardier revised its settlement agreement, and sent it to Nicholas Air on May 26, 2023. (Ex. 9).

[Brief at 11].

In their brief, plaintiffs describe further contacts made by Bombardier to Nicholas in

Mississippi, relating to the dispute in this case, as follows:

> On or about March 29, 2023, at Bombardier's insistence, Bombardier received One Hundred Thirty-Five Thousand and 00/100 Dollars ($135,000.00) from Nicholas Air as a prepayment for a repair on Aircraft 20860/633N, despite the fact that Aircraft 20860/633N was under warranty. (Dkt. 6 at ¶ 19-20). On April 13, 2023, Bombardier sent Nicholas Air an invoice for the repair. (*Id.* at ¶ 25). After wrongly demanding a prepayment from Nicholas Air and holding it for almost four months, Bombardier mailed to Nicholas Air, in Mississippi, a check for One Hundred Twenty-Seven Thousand Six Hundred Forty-Three and 85/100 Dollars ($127,643.85) on or about July 14, 2023, to return the unused portion of the One Hundred Thirty-Five Thousand and 00/100 Dollars ($135,000.00) Nicholas Air paid to repair to Aircraft 20860/633N, since the repair was warranty-covered. (*Id.* at ¶¶ 22-27). (The difference was withheld by Bombardier to pay for the technician's travel costs, which Bombardier had previously assured Nicholas Air would be covered. (*Id.*).)
>
> On August 3, 2023, Bombardier sent Nicholas Air a proforma invoice for the throttle quadrant assembly needed for Aircraft 20833/623N, requiring prepayment of One Hundred Sixty- Four Thousand Seven Hundred Fifty-Five and 00/100 Dollars ($164,755.00) for the part, even though Bombardier's parts department had previously quoted about one-third of that price. (*Id.* at ¶¶ 29, 40). Bombardier received the requested wire from Nicholas Air the next day. (*Id.* at ¶ 42).
>
> As Bombardier subsequently insisted that it would not sell the part without Nicholas Air's agreement to be bound by a separate set of Terms and Conditions, which Nicholas Air could not agree to, Bombardier wired the funds back to Nicholas Air in Mississippi, on or about August 9, 2023. (*Id.* at ¶¶ 44-48).

[Brief at 14].

This court is unpersuaded by defendants' attempts to minimize this evidence, which it

finds to represent highly purposeful contacts on the part of Bombardier with Mississippi in

general, and with plaintiffs in particular.  In light of these contacts, this court finds that

defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within

[Mississippi], thus invoking the benefits and protections of its laws," *see Asahi*, 480 U.S. at 109

and that maintenance of this suit "would not offend traditional notions of fair play and

substantial justice." *Woodson*, 444 U.S. at 292.  In arguing otherwise in their reply brief,

defendants characterize plaintiffs' jurisdictional proof as a "grab bag" of allegations, and it is true that, considered individually, many of defendants' Mississippi contacts would likely be insufficient to give rise to personal jurisdiction. This court believes, however, that, considered as a whole, plaintiffs' proof is more than sufficient to establish personal jurisdiction over defendants in this case.[5]

While this court thus agrees fully with plaintiffs' briefing on the personal jurisdiction issue, it wishes to place additional emphasis on an issue which it regards as significant in this context. This court notes that, in their briefing, defendants place heavy emphasis on the fact that the actual repairs on the airplanes in this case were carried out at BAC facilities located in states other than Mississippi. [Reply brief at 3]. Defendants further argue that "while the Warranties contemplate an ongoing business relationship, they do not contemplate it centered where the operator happens to reside; they contemplate it where the Warranty work by the manufacturer must be performed – at BAC and BI facilities outside of Mississippi." *Id.* Defendants then cite authority holding that, where claims are based on contracts with a forum resident, a key consideration is where the defendant was obligated to perform its duties under the contract. *See Danziger & De Llano, L.L.P. v Morgan Verkamp, L.L.C.*, 24 F.4th 491, 502 (5th Cir. 2022) (no purposeful availment where defendant "did not perform in [forum state] and was not required to perform in [forum state]").

---

[5] In arguing otherwise, defendants rely heavily upon the Fifth Circuit's decision in *Pervasive Software Inc. v. LexwareGmbH & Co. KG*, 688 F.3d 214, 223 (5th Cir. 2012), but this court finds this decision distinguishable, for the reasons stated in plaintiff's brief, and also because, as discussed below, plaintiffs assert a good faith and fair dealing claim based upon allegedly tortious conduct which occurred partly in Mississippi. [Brief at 22-23]. Nothing similar was alleged by the plaintiff in *Pervasive*.

This court does not doubt that, in most repair warranty cases, the location where the repairs were to be performed would, in fact, be highly relevant, if not dispositive, on the personal jurisdiction issue. In this particular case, however, this court believes that to merely focus on the location where the repairs were to be performed constitutes an unduly narrow reading of plaintiffs' claims and of the facts of this case. In so stating, this court emphasizes that plaintiffs' claims in this case are heavily based on the nature of the communications and negotiations between the parties relating to the issue of what was covered under the Warranty, rather than on the manner in which the repairs were conducted. Indeed, this is so much the case that, if this court were to quote every instance in which the complaint alleges coercive or unfair statements by Bombardier during their negotiations, then it would quote virtually the entire complaint.

It seems clear that plaintiffs' claims themselves are based largely upon what Bombardier told them regarding their warranty disputes, in emails which were purposefully directed towards Nicholas in Mississippi. Indeed, plaintiffs assert both breach of contract and breach of the duty of good faith and fair dealing claims, and each of these claims rely heavily upon things that Bombardier said and positions which it took during the post-warranty dispute negotiations with Nicholas. Specifically, plaintiffs allege that:

**Breach of Contract**

57. Under the Warranties, Bombardier was and is contractually obligated to make repairs and provide parts for Aircraft 1 and Aircraft 2, and wholly refuses to adhere to its contractual obligations.
58. Bombardier has also unilaterally implemented extracontractual terms by preventing utilization of the Warranties if there is a NSNS designation or overall block on the account.
59. Bombardier breached the Warranty on Aircraft 1 by refusing to provide parts covered under the Warranty.
60. Bombardier breached the Warranty on Aircraft 2 by refusing to provide parts covered under the Warranty.
61. Bombardier breached its agreement to provide the Throttle Quadrant Assembly for Aircraft 2, upon receipt of the bank verification letter, documentation of the fault, and full

prepayment for the part.

62. Regarding the repair of Aircraft 1 in March 2023, Bombardier assured Nicholas Air, in writing, that travel expenses for its technician would be covered by the Warranty. Nicholas Air detrimentally relied on this assurance, and Bombardier breached this agreement by invoicing Nicholas Air for travel expenses and refusing to remove the travel expenses pursuant to the agreement.

63. Bombardier breached its agreement to return to Nicholas Air the One Hundred Twenty-Seven Thousand Four Hundred Thirty-Six and 85/100 Dollars ($127,436.85) owed to

Nicholas Air by delaying return of the funds for three months.

64. Bombardier has further breached its agreement to use the One Hundred Twenty-Seven Thousand Four Hundred Thirty-Six and 85/100 Dollars ($127,436.85) owed to Nicholas

Air to provide the Warranty-covered parts for Aircraft 2.

65. Plaintiffs suffered substantial financial harm including lost profits as a result of Bombardier's breaches of contract.

### Breach of the Duty of Good Faith and Fair Dealing

66. Implicit in the Warranties is the duty of good faith and fair dealing in their performance.

67. Bombardier breached its duty by requiring Nicholas Air to prepay the full outright cost of warrantied parts before it would provide them, when the Warranty did not contain such a requirement. In the case of the Quadrant Throttle Assembly, the full outright price Bombardier demanded was three times the amount Bombardier initially quoted to Nicholas Air.

68. Bombardier breached its duty by requiring Nicholas Air to satisfy its excessive demands for information about the faults of warrantied parts before even providing pro forma invoices to enable Nicholas Air to order the parts, even though Nicholas Air was required to fully prepay. This requirement is also not part of the Warranty.

69. Bombardier breached its duty by refusing to provide warrantied parts – even with full prepayment and after satisfying its information requests – unless Nicholas Air agreed to its Terms and Conditions, which were not part of the Warranty.

[Second amended complaint at 10-11].

This court notes that Bombardier's own version of the facts of this case, as set forth in its

arbitration demand, likewise describes this case as involving a dispute which is based heavily

upon what was said and what position the parties took during their negotiations.  Specifically,

Bombardier alleges that:

2. In June 2023, Nicholas Air – which has a history of repeatedly defaulting on

payments owed to Bombardier – asked Bombardier to cover the cost of certain replacement parts under warranty. Nicholas Air informed Bombardier that it wanted to continue operating the aircraft while Bombardier performed its warranty coverage evaluation. Purely as an accommodation, and notwithstanding that it had no contractual obligation to do so, Bombardier offered to sell Nicholas Air replacement parts to install on the plane while Bombardier evaluated warranty coverage, provided Nicholas Air (i) prepay for the replacement parts; (ii) ship Bombardier the unserviceable parts for examination; and (iii) agree to comply with the applicable terms and conditions that govern Bombardier's sale of spare parts. Bombardier agreed to refund the purchase price if it thereafter determined the cost of replacing the unserviceable parts was covered by the warranty. Nicholas Air rejected Bombardier's offer, and claimed that (i) the warranty obligated Bombardier to ship spare parts without prepayment; (ii) Nicholas Air was not obligated to ship the unserviceable parts to Bombardier; and (iii) Nicholas Air was not bound by the applicable spare parts terms and conditions because they were not part of the warranty – all of which completely ignores that Bombardier's proposed transaction was not required under the warranty, and was instead an entirely discretionary accommodation that Bombardier was offering to address Nicholas Air's desire to operate the aircraft while Bombardier completed the warranty coverage evaluation.

3. In total disregard of the arbitration clause that applies to warranty disputes, Nicholas Air then commenced an action in Mississippi federal court.

[Arbitration demand at 1-2]. Bombardier itself thus describes the negotiations in this case as highly substantive ones which (it appears to this court) effectively modified warranty provisions, even though defendant insists that it was merely offering plaintiff "accommodations" which it was not obligated to provide under the Warranty.

It is thus undisputed that highly substantive negotiations took place between the parties regarding the issue of Bombardier's obligations under the Warranty, and plaintiffs allege that these negotiations resulted in a staggering amount of emails between them. Specifically, plaintiffs write in their brief that:

Bombardier has engaged in extensive communications with Mississippi. Between April 1, 2019, and October 19, 2023, Plaintiffs, in Mississippi, exchanged Twenty-Four Thousand Three Hundred Forty-Eight (24,348) emails with Bombardier. Over the ninety day period ending October 19, 2023 alone, Plaintiffs received Four Hundred Twenty-Six (426) emails *from* Bombardier, and sent Seventy-Six (76) emails to Bombardier. Plaintiffs' phone records show Two Hundred Twenty (220) phone calls (not including calls to or from cell phones) with Bombardier, including Seventy-One (71) incoming calls.

Bombardier admits it engaged in "extensive negotiations for more than sixty days" with

Nicholas Air, after the warranty disputes arose. (Dkt. 23 at ¶ 6). According to Bombardier's Director of Legal Services, she and Nicholas Air's Chief Operating Officer and General Counsel negotiated about warranty administration since at least the first week of July 2023. (*Id.*).

[Brief at 14].

In rebuttal, defendants write that ""[e]ngaging in communications related to the execution and performance of the contract" is "insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004). This court submits, however, that exchanging over twenty-four thousand e-mails with a Mississippi company constitutes "communication" in the same manner in which the water running from St. Paul to New Orleans constitutes a river. The sheer volume of the emails aside, this court emphasizes that 1) many of the emails in question were not simply "communications" but highly substantive negotiations which, at times, effectively altered one or more party's obligations under the Warranty; 2) Bombardier purposefully directed those emails at Nicholas, a Mississippi company and 3) plaintiff's actual claims in this case are largely based upon Bombardier's statements and positions during those negotiations. These conclusions are significant in light of well-established authority that "[a] court may exercise specific jurisdiction when (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendants' contacts with the forum state." *Helicopteros Nacionales de Colombia*, S.A. v. Hall, 466 U.S. 408, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

In concluding that plaintiffs' claims "arose out of or are related to" defendants' contacts with Mississippi, this court believes that it is important to emphasize that the complaint asserts a claim for breach of the duty of good faith and fair dealing, and not merely a breach of contract

claim. As quoted above, this duty of good faith and fair dealing claim is based largely upon allegations that the numerous e-mails sent by Bombardier to Nicholas in Mississippi included demands that Nicholas do things which were not required by the Warranty and that it sought to exploit plaintiff's desperate situation, as a small airliner dependent upon working airplanes, to force it to yield to their demands.

Mississippi law is clear that "the claim of breach of the covenant of good faith ... asserts a [claim in] tort," *see Lippincott v. Miss. Bureau Of Narcotics,* 856 So.2d 465, 468 (Miss. Ct. App. 2003), *citing Braidfoot v. William Carey College,* 793 So.2d 642, 651 (Miss. Ct. App. 2000), and this court regards this fact as being of jurisdictional significance in this case, in several important ways. This court concludes, for example, that plaintiffs' assertion of a tort claim serves to further rebut defendants' argument that "[w]here claims are based on contracts … the touchstone for specific jurisdiction is where the defendant was obligated to perform," [reply brief at 2] since plaintiffs do not merely assert contract claims in this case. Plaintiffs' good faith and fair dealing claim also casts (even further) doubt upon defendants' argument that the numerous emails sent by Bombardier to Mississippi were mere "communications," since allegedly tortious conduct is clearly more than mere "communication," even if it takes written form.

This court also regards plaintiffs' good faith and fair dealing claim as providing an additional basis for finding that the requirements of Mississippi's long-arm statute are met in this case, above and beyond those mentioned in their brief. Indeed, § 13–3–57 permits the exercise of personal jurisdiction over "[a]ny nonresident . . . corporation . . . who shall commit a tort in whole or in part in this state against a resident or nonresident of this state," and it seems clear to this court that, in asserting their good faith and fair dealing claim, plaintiffs allege tortious conduct which occurred at least partly in Mississippi. In failing to so argue in their brief,

plaintiffs may have been unaware of *Lippincott*'s holding that good faith and fair dealing claims are tort claims, but it seems clear that they are, and this fact serves to further distinguish many of defendants' arguments and authorities in this case, including (as mentioned previously) the Fifth Circuit's decision in *Pervasive*. This court therefore agrees with plaintiffs that personal jurisdiction exists over defendants, both under the Mississippi long-arm statute and under constitutional principles of due process.

Having addressed the personal jurisdiction issues in this case, this court now addresses the arbitration issues raised by the parties. In doing so, this court must address the twin questions of 1) whether this dispute should be arbitrated, and 2) whether this question of arbitrability should be decided by this court or by the AAA. In their preliminary injunction motion, plaintiffs assert that the AAA has, for all intents and purposes, decided that this case is arbitrable, based on a December 13, 2023 letter in which it informed the parties that:

> Dear Party Representatives,
> After careful consideration of the comments submitted by the parties and review of the documents in our possession, the ICDR, pursuant to its authority under the applicable rules, has made an administrative determination that Claimant has met the filing requirements. Accordingly, in the absence of an agreement by the parties or a court order staying this matter, the ICDR will proceed with the administration of this matter. If the parties agree or a court orders a stay of the case, please let us know and we will abide by such agreement or court order.

[Plaintiff's exhibit 9].

It is unclear to this court whether, by writing that it "has made an administrative determination that Claimant has met the filing requirements," the AAA was making a formal finding that this case is arbitrable. Considering the above language as a whole, it appears that the AAA has made a *tentative* finding that Nicholas' claims against Bombardier are arbitrable, but its language referencing the possibility of a contrary order from this court appears to suggest that it does not regard this matter as either definitively established or outside of this court's authority

to decide. This court notes that arbitrators do, in fact, often decide the "gateway" question of arbitrability, in cases where the arbitration provision so provides. In this case, the arbitration provision is quite broad, providing for the arbitration of "any dispute, controversy, or claim relating directly or indirectly to, or arising out of or in connection with this Agreement." [Arbitration agreement at *Id.* § 4.5]. While this court can discern a reasonable argument that this language is sufficiently broad to include the question of arbitrability, it believes that this issue would be much clearer if the provision had specifically delegated the question of "arbitrability" to the arbitrator.

The vagueness of the arbitration provision's language aside, it appears that a very significant obstacle to defendants' arguments that the arbitrator should decide arbitrability lies in the fact that Nicholas did not actually sign the arbitration agreement in this case. As noted previously, Bombardier originally sold the airplanes in question to Brazilian and California companies, and it is undisputed that they actually signed the Arbitration Agreement which was contained in the Purchase Agreement for the airplane. (Arbitration Demand at 3]. In its arbitration demand, Bombardier asserts that, when that Brazilian company sold its used airplane to Nicholas, both the Warranty on the planes and the requirement that any disputes between the parties be arbitrated were transferred along with it.

While, as discussed below, this court ultimately agrees with Defendant's arguments in this regard, it believes that the fact that Nicholas did not sign the Arbitration Agreement in this case casts serious doubt upon its argument that the question of arbitrability is one for the arbitrator, and not this court. In so stating, this court notes that the Fifth Circuit ruled in a recent decision that deciding whether or not an arbitration agreement should be enforced against a non-

signatory, such as on the basis of equitable estoppel, is a question for courts and not arbitrators.

Specifically, the Fifth Circuit wrote that:

> The parties vigorously dispute whether the district court should have decided whether Plains can enforce the Newman–Cypress arbitration agreement. Cypress admits that deciding whether an arbitration agreement exists between the parties is "always for the court."[7] But both it and Plains see a distinction between deciding whether an arbitration agreement *exists* (a question for the court) and deciding who it is *enforceable against* (a question they say is delegable to the arbitrator). Newman sees no distinction. Under controlling caselaw, says Newman, we must decide whether Plains can enforce the Newman–Cypress arbitration agreement; not an arbitrator. We agree with Newman. When a court decides whether an arbitration agreement exists, it necessarily decides its enforceability between parties. Therefore, deciding an arbitration agreement's enforceability between parties remains a question for courts.
>
> We have explained before that courts must decide "at the outset" whether an enforceable arbitration agreement exists at all. *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.,* 921 F.3d 508, 514 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.,* 352 F.3d 211, 218 (5th Cir. 2003)). The parties cannot delegate disputes over "the very existence of an[ ] [arbitration] agreement." *Id.* (quoting *Will-Drill*, 352 F.3d at 218). The Supreme Court recently "reaffirmed" this rule. It explained in *Henry Schein, Inc. v. Archer and White Sales, Inc.* that the FAA requires courts to first "determine[ ] whether a valid arbitration agreement exists" before granting motions to compel arbitration. 139 S. Ct. 524, 530, 202 L.Ed.2d 480 (2019) (citing 9 U.S.C. § 2).
>
> To that end, deciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin. We said as much in *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379 (5th Cir. 2008) (per curiam). Under "the first step in determining whether a valid agreement to arbitrate exists," we look first to "the 'terms of the agreement,' " which "dictate '[w]ho is actually bound by an arbitration agreement.' *Id.* at 382. Then, "[i]f that fails," we "look to theories such as equitable estoppel to determine whether a nonsignatory may compel arbitration." *Id.*; *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) Under both the Supreme Court's and our caselaw, then, Newman has the better view. It is up to us—not an arbitrator—to decide whether Plains can enforce the Newman–Cypress arbitration agreement.

*Newman v. Plains All Am. Pipeline, L.P.,* 23 F.4th 393, 398-99 (5th Cir. 2022)(citations omitted).

The Fifth Circuit thus made it plain in *Newman* that, when the agreement between the parties fails to clearly resolve who is bound by it, we "look to theories such as equitable estoppel to determine whether a nonsignatory may compel arbitration." *Id.* Defendants argue that

*Newman* is distinguishable from this case, but this court is unpersuaded that it is. The Fifth

Circuit's reference to "we" in *Newman* clearly refers to the courts, and, in this case, Bombardier

specifically relies upon equitable estoppel arguments in contending that Nicholas should be

bound by the arbitration agreement signed by the companies from which it purchased the used

airplanes. For example, defendant argues in its brief that:

> Having "knowingly accepted the benefits" of the Warranty for years and now asserting
> claims under it, Nicholas Air cannot repudiate the arbitration clause: allowing it to do so
> would "disregard equity and contravene the purposes underlying enactment of the
> [FAA]." *Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss. 2004) (citation
> omitted).

[Reply brief at 13-14].

Defendant thus relies upon the Mississippi Supreme Court's 2004 decision in *Terminix v.*

*Rice*, and, as discussed below, this court agrees that it constitutes strong authority in support of

its arbitration arguments in this case. However, *Rice* is clearly an equitable estoppel case, which,

in light of the Fifth Circuit's decision in *Newman*, undercuts defendant's arguments that the

arbitrator should decide the applicability of that doctrine. In light of *Newman*, this court

concludes that it, and not the arbitrator, should decide the applicability of the equitable estoppel

doctrine in this case. Indeed, *Newman* aside, defendant must, in relying upon *Rice*, recognize

that it was the Mississippi Supreme Court, and not an arbitrator, writing these words.

Having concluded that it must decide the arbitrability issues in this case, this court finds

that defendants have two (successful) paths for holding Nicholas to the terms of the arbitration

agreement in this case. The first of these paths involves a more direct contractual path arising

from the conditional assignments of the warranties in this case to Nicholas, and the second

involves the aforementioned equitable estoppel doctrine based on the fact that plaintiff has

consistently sought, and obtained, the benefits of the Warranty in this case (albeit not to the

extent which, it claims, it was entitled).

As to the first path, based on the assignment of the warranty, defendants write in their

brief that:

> Plaintiffs argue that Nicholas Air is not bound by the arbitration clause because it is not a party to the Purchase Agreement, and the resale agreement between Nicholas Air and the original buyer did not "fully incorporate[]" the arbitration clause. Opp. at 28. This, however, overlooks the effect of the original buyer assigning the Warranty to Nicholas Air. *See* Dkt. 41-11 §6.1 ("Seller hereby assigns such warranties to [Nicholas Air] at the time of delivery and agrees to take such other reasonable steps, at [Nicholas Air's] expense, as will enable [Nicholas Air] to process warranty claims directly with the manufacturers"). The "common law speaks in a loud and consistent voice: an assignee stands in the shoes of his assignor." *Cadle Co. v. 1007 Joint Venture*, 82 F.3d 102, 105 (5th Cir. 1996) (citation omitted); *see also Jakobovits v. Alliance Life Ins. Co. of N.A.*, No. 15cv9977, 2017 WL 3049538, at *3 (S.D.N.Y. July 18, 2017) ("[a] valid assignee stands in the shoes of the assignor as to the assignor's rights and obligations under the original contract") (internal quotation marks, alterations and citation omitted) (first alteration added). Thus, if an assignor was obligated to arbitrate, so too is the assignee.
>
> Such is the lesson of *Cabrales v. Midland Credit Mgmt.*, in which a credit card issuer assigned to a debt collector a customer agreement that included an arbitration clause. No. 3:20-CV-01703-X, 2020 WL 6145110, at *2 (N.D. Tex. Oct. 7, 2020). The customer sued the debt collector, and the debt collector moved to compel arbitration. The court granted the motion, holding that as the "current owner" of the customer's account, the debt collector "may stand in the shoes of the original party to the credit card account agreement and enforce [the original party's] rights – including the provisions compelling arbitration and prohibiting class action suits – in disputes involving the contract." *Id.* (internal quotation marks and citations omitted). Because the Warranty obligated the original purchaser of the Aircraft to arbitrate Warranty disputes, so too must Nicholas Air as assignee.

[Reply brief at 12-13]. As to the second path, based on the equitable estoppel doctrine,

defendants write in their brief that:

> Separate and apart from its status as an assignee, Nicholas Air is also obligated to arbitrate Warranty disputes because it has received the benefits of the Warranty. "[N]on–signatories who, during the life of the contract, have embraced the contract despite their non–signatory status" are estopped from then, "during litigation, attempt[ing] to repudiate the arbitration clause in the contract." *Fireman's Fund Ins. Co. v. Regions Ins. Inc.*, No. 1:17-CV-0195-GHD-DAS, 2018 WL 1630946, at *4 (N.D. Miss. Apr. 4, 2019) (where

21

contract between insurer and its agent had arbitration clause, non-signatory broker was
compelled to arbitrate claim against agent because broker had derived direct benefit –
commissions – from insurer/agent contract); *see also Deloitte Noraudit A/S v. Deloitte
Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993); *Thomson-CSF, S.A. v. Am. Arb.
Ass'n,* 64 F.3d 773, 778 (2d Cir. 1995) (reversing and holding that non-signatory
claimant that had "knowingly accepted the benefits" of agreement with arbitration clause
was obligated to arbitrate); *Masztal v. Meritplan Ins. Co.,* 586 F. Supp. 2d 662, 667 (S.D.
Miss. 2008) (where non-signatory plaintiff's claims all stemmed from alleged breach of
contract containing arbitration provision, signatory defendant was entitled to compel
arbitration against plaintiff).

Over the last three years, Nicholas Air has submitted Warranty claims to – and received
Warranty coverage from – BI. In this lawsuit, Nicholas Air seeks a declaration that
"Nicholas Air has the right to Warranty coverage" from BI and seeks damages for the
"substantial financial harm" it claims to have suffered because of BI's alleged breach.
SAC ¶¶ 65, 70, 73. Having "knowingly accepted the benefits" of the Warranty for years
and now asserting claims under it, Nicholas Air cannot repudiate the arbitration clause:
allowing it to do so would "disregard equity and contravene the purposes underlying
enactment of the [FAA]." *Terminix Int'l, Inc. v. Rice*, 904 So. 2d 1051, 1058 (Miss.
2004) (citation omitted).

[Reply brief at 13-14]. This court finds defendants' arguments persuasive on each path.

In opposing arbitration, plaintiffs rely primarily upon the fact that the Warranty and the

Arbitration Agreement are set forth in different documents, and they assert that this fact allows

them to benefit from the warranty provisions which were assigned to them without being subject

to the arbitration provision. Specifically, plaintiffs write in their brief that:

Bombardier Inc. does not dispute that Nicholas Air has a valid warranty. That warranty is
established in a document titled "Aircraft and Customer Support Description." (*See* Dkt.
25-2, at 13, 38-39). The Aircraft and Customer Support Description is a different
document than the APA [Aircraft Purchase Agreement] between Bombardier Inc. and the
original buyer of the aircraft. . . . What the warranty actually says and what Bombardier
told the Court the warranty says are different. The warranty actually says:
> The Warranty is accessory to the Aircraft and follows the rights to the Aircraft
> without requirement of Seller's approval for transfer. The Warranty is for the
> benefit of Buyer, its successors and all persons to whom title to the Aircraft may
> be transferred during the Warranty periods set forth herein, provided that any
> successor or owner shall remain subject to the applicable provisions of the
> ***Agreement*** to the same extent as the Buyer.
(Dkt. 25-2 at 39, § 7.13 (emphasis added)). Bombardier, however, added the word
"Purchase" when it quoted the provision in its brief:
> The Warranty provides, in relevant part, that it is an "accessory to the Aircraft and

> follows the rights to the Aircraft without requirement of Seller's approval for
> transfer . . . provided that any successor or owner shall remain subject to the
> applicable provisions of the ***[Purchase]*** Agreement to the same extent as Buyer."
> (Dkt. 22 at 18-19) (emphases added and removed). The provision as actually written
> allows the warranty to follow subsequent purchasers of the aircraft if the purchaser agrees
> to the provisions of the "Agreement", i.e., the Warranty. Bombardier tries to argue that
> "Agreement" means "Purchase Agreement", but it can only make that argument by
> inserting a word that is not in the provision. "Agreement" is not defined in the warranty,
> but its obvious meaning would be the warranty itself. To the extent, however, that the
> term "Agreement" is ambiguous, then the term must be construed against the drafter of
> the document, which is Bombardier, and in favor of Nicholas Air. *Banks v. Banks*, 648
> So.2d 1116, 1121 (Miss. 1994).

[Brief at 28-30].

Plaintiffs thus appear to acknowledge that, if the word "Agreement" in the Warranty is

understood to refer to the Purchase Agreement, then they would be subject to the arbitration

provisions set forth in that Agreement, under ordinary contract principles and without any need

to consider whether equitable estoppel is applicable. Moreover, while it is true that defendants

inserted the word "[Purchase]" before "Agreement" in their brief, they did so in brackets, and

this court accordingly does not regard this insertion as an attempt to mislead it. This court

further agrees with defendants that, considering the overall language of the various contracts in

the case, the term "Agreement" is properly understood as a reference to the Purchase Agreement

and not, as plaintiffs suggest, to the Warranty itself.

In so concluding, this court begins with the obvious fact that the word "Agreement" is

contained within the terms "Purchase Agreement," but it is not contained within the word

"Warranty." Plaintiffs suggest that "Agreement" actually means "Warranty," but if that were the

case, why didn't the drafter simply use the word "Warranty," which has fewer letters than

"Agreement"? By contrast, it seems understandable, if less than ideal, that a drafter would

choose to use the term "Agreement" as a shorthand for "Purchase Agreement," particularly since

the word "Agreement" is contained within the term "Purchase Agreement," and all parties were

well aware that the purchase of an airplane was what the instant transaction was all about. By contrast, this court believes that "Agreement" is a poor shorthand for the term "Warranty," since the latter term is generally understood as something purely beneficial offered by the seller, while the former term is generally understood as a contract in which both sides are obligating themselves to do certain things.

This court further notes that § 7.9 of the Warranty provides that "[t]he Warranty shall not apply to … [a]ny accessory, equipment or part incorporated in the Aircraft, which is not furnished pursuant to this Agreement." [Dkt. 25-2 at 39, § 7.9]. This language strengthens this court's conclusion that the term "Agreement" refers to the Purchase Agreement, since it suggests that, contrary to plaintiffs' argument, "Agreement" means something other than the Warranty. Moreover, the fact that the language refers to "accessor[ies] or equipment" being "furnished pursuant to this Agreement" is clearly consistent with a purchase agreement, but not a warranty. In so stating, this court submits that, when considering either an automobile or airplane purchase, the decision of what "bells and whistles" to include with the purchase is something which is decided in the purchase agreement. A manufacturer's warranty, in turn, typically incorporates and follows whatever equipment the purchaser agrees to buy, under the basic principle of "if we sell it, we warrant it." It would, however, be nonsensical to state that the equipment in question was "furnished" pursuant to the warranty, since a warranty does not determine what equipment is furnished during a sale: the purchase agreement between the buyer and seller does that. This court accordingly believes that any resale purchaser reading the Warranty language as a whole should have understood what was meant by the term "Agreement" in this case.

In the court's view, the last phrase in § 7.13 the Warranty, quoted above, makes it even clearer that the term "Agreement" refers to the "Purchase Agreement," since the phrase makes

24

clear that resale purchasers will obtain the benefits of the warranty "provided that any successor or owner shall remain subject to the applicable provisions of the Agreement to the same extent as the Buyer." *Id.* By using the "provided that" and "subject to" language, the phrase makes explicit what this court frankly believes that any sophisticated business entity such as Nicholas would instinctively understand, namely that there are no free lunches in business transactions and that, if Bombardier is expected to transfer its obligations under the Warranty to a subsequent purchaser, then that purchaser must, for its part, live up to the commitments to which the original purchaser obligated itself when it first bought the airplane.

In this case, the commitments made by the original purchaser included the arbitration agreement set forth in the Purchase Agreement, and it frankly strikes this court as irrational for any subsequent purchaser such as Nicholas to have thought that Bombardier had some unique affinity for resale purchasers such that it would offer them highly expensive aircraft repairs for free while giving up the quite detailed and robust arbitration provision which it had provided for itself in the Purchase Agreement. Indeed, this court seriously doubts that Bombardier has any greater eagerness to engage in costly litigation filed by a resale purchaser than by the original purchaser, and it seems irrational for Nicholas to have believed otherwise.

Of course, if Bombardier had neglected to include a provision in the Warranty which gave legal effect to this obvious intention on its part, then it might simply be out of luck. In reality, however, Bombardier was careful to include language which made clear that a subsequent purchaser would benefit from the warranty, but with the explicit caveat that this would only happen "provided that any successor or owner shall remain subject to the applicable provisions of the Agreement to the same extent as the Buyer." It seems clear to this court that, in so writing, Bombardier was making it plain that any subsequent purchaser had to taste the sour

of the Purchase Agreement if it wished to taste the sweet of the Warranty, and it believes that this language is entirely consistent with what a sophisticated business entity such as Nicholas would have assumed was the case to begin with. Moreover, while this court agrees that it would have been preferable for Bombardier to have used the term "Purchase Agreement" rather than "Agreement," it does not regard its failure to do so as being sufficient to render the provision ambiguous.

In light of the foregoing, this court concludes that Nicholas is subject to the arbitration provision under ordinary contract principles, but, assuming that it has erred in so concluding, it still believes that Bombardier should be able to compel arbitration under the doctrine of equitable estoppel. As quoted above, there is extensive authority supporting the notion that a plaintiff may not claim the benefits of a contract and thereupon seek to avoid being held subject to its arbitration provisions simply because he did not personally sign it. As observed by the Mississippi Supreme Court in *Rice*:

> In the arbitration context, the doctrine [of estoppel] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the Arbitration Act.

*Rice*, 904 So. 2d at 1058, quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000).

In this case, it cannot seriously be questioned that Nicholas has sought and obtained a very significant amount of free repairs and other benefits from Bombardier's Warranty, and it seeks to claim even more such benefits in this case. That leaves as the only question in this court's mind whether the Purchase Agreement containing the arbitration provision should be considered the "same contract" as the Warranty, within the meaning of *Rice*. In concluding that

it should, this court reiterates its belief that the Warranty's language making any subsequent purchaser's ability to claim benefits conditional upon compliance with the "Agreement" serves to incorporate the Purchase Agreement into its provisions. However, this court's alternative discussion of the doctrine of equitable estoppel presupposes that it has erred in so finding, and, if it is to find the Warranty and Purchase Agreement to be the "same contract" within the meaning of the equitable estoppel doctrine, then it arguably must do so on some other basis than its interpretation of the term "Agreement."

The contractual language in this case aside, it seems clear to this court that the Warranty in this case is a *sales* warranty, and it is beyond dispute that Bombardier would only have made that Warranty to a lawful purchaser of one of its planes. It further seems clear that the provisions of the Purchase Agreement, including its arbitration provision, represent the terms upon which Bombardier was willing to sell its airplanes to the original purchaser in this case. In light of these facts, this court concludes that the Warranty and Purchase Agreement are properly considered to be the "same contract" within the meaning of the equitable estoppel doctrine. Indeed, this court submits that this is the correct conclusion based upon ordinary contract principles and without any resort to equitable principles at all, but it regards this as even clearer in the equity context, where traditional contract principles must sometimes yield to what is fair.[6] This courts so finds because, in spite of the fact that they are set forth in different documents, the Purchase Agreement and Warranty were clearly part of the same contractual sales transaction in this case. This court believes that this issue is even clearer if it is allowed to consider equitable

[6] In so stating, this court notes that, in *Rice* and similar cases, courts have frequently excused the fact that a particular party did not even sign the contract in question, even though such is ordinarily required as a matter of contract law. It would therefore be anomalous to strictly and inflexibly apply other requirements of contract law in the equitable estoppel context.

principles as well, given its previously-stated belief that no sophisticated business entity such as Nicholas could have believed that Bombardier would have been willing to transfer its obligations under the Warranty to a subsequent purchaser unless it was also allowed to obtain the contractual *benefits* which it had negotiated for itself with the original purchaser, including the right to demand arbitration of any claims against it.

In light of the foregoing, this court concludes that, when Nicholas decided to claim extensive benefits under the Warranty in this case, it should have been fully aware that it was subjecting itself to the same obligations which were agreed to by the original purchaser in the Purchase Agreement. This court further concludes that it would be inequitable to permit Nicholas to obtain the benefits of the original sales transaction and thereupon to avoid its burdens, simply because the Warranty incorporated the "Agreement" into its provisions, rather than specifying that it was referring to the "Purchase Agreement." For the reasons discussed above, this court believes that Nicholas should have understood what was intended by this contractual language, based upon the language of the Warranty as a whole, based upon well-established business practices and based upon the nature of the sales transaction in this case. This court accordingly concludes that, having tasted the sweet of the Warranty in this case, Nicholas must taste the sour of the Purchase Agreement as well, and that it is subject to the arbitration provision in this case based both upon ordinary contract principles and the doctrine of equitable estoppel.

Having decided which parties the arbitration agreement applies to, this court has considerable doubt whether, under *Newman*, it should decide the other arbitrability arguments raised by Nicholas or whether it should leave this for the arbitrator. This court leans towards the latter view, but it notes for the record that plaintiff's remaining arguments are based primarily

upon unconscionability arguments (such as that it would be unfair to require it to incur the expense of arbitrating in New York) which very rarely succeed in the Fifth Circuit. *See, e.g. Williams v. Cmty. Bank, Ellisville*, 821 F. App'x 292, 296 (5th Cir. 2020)(noting that the Mississippi Supreme Court has made clear that the mere " 'risk' that [a litigant] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.). This court further notes that plaintiff's unconscionability arguments are almost entirely lacking in supporting authority, and it therefore has serious doubts whether it will be able to prevail on those arguments before the arbitrator. Regardless, this court concludes that it should leave a final resolution of this issue to the arbitrator, rather than making formal findings in this regard itself.

A final issue for this court's consideration is whether it should stay the claims against co-defendant BAC, which the parties agree are not subject to arbitration, while the arbitration against BI is proceeding. The Fifth Circuit has held that, when deciding whether non-arbitrable claims were subject to a mandatory stay, a district court should decide (1) whether the arbitrated and litigated disputes involve the same operative facts; (2) whether the claims are inherently inseparable; and (3) the litigation is likely to have a "critical impact" on the arbitration. *Waste Mgmt., Inc. v. Residuos Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 343 n.6 (5th Cir. 2004). As to these factors, defendants argue in their reply brief that:

> Plaintiffs contend that, because the arbitrable and non-arbitrable claims involve two different planes, the facts are different and the claims separable, and thus the first two factors weigh against a mandatory stay. Opp. at 34. But the claims for Aircraft 1 and 2 arise out of the same operative facts (two identically worded Warranties for the same type of aircraft) and raise the identical legal question (whether and, if so, on what terms, Nicholas Air may obtain replacement parts). Plaintiffs themselves implicitly recognized the overlapping facts and inseparable nature of their claims when they asserted a single cause of action for breach of both Warranties and requested a single declaration of rights for both Warranties. SAC ¶ 73 ("Plaintiffs request a declaration that Nicholas Air has the right to Warranty coverage for Aircraft 1 and Aircraft 2").

With respect to the third factor, Nicholas Air misunderstands the law. Nicholas Air claims that "[s]taying Plaintiffs' claims against BAC would undermine *Plaintiffs'* right" to litigate. Opp. at 36. The question, however, "is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration." *Waste Mgmt.*, 372 F.3d at 343 (citation omitted).

Given the persuasive "effect of a federal judgment," the BI-Nicholas arbitration panel will "necessarily be strongly influenced to follow the court's determination," and BI's liability will "incontrovertibly be seriously affected by the court's determination of [BAC's] liability" should this litigation proceed. *Id.* at 345 (citation omitted).

[Reply brief at 18-19].

This court agrees with defendants' arguments in this regard, and it further agrees that the close relationship between the warranty issues in the arbitrable and non-arbitrable claims would likewise support the entry of a stay under this court's ordinary discretion to order such stays. Indeed, separate from the requirements of the FAA, this Court also retains the discretionary power "to stay the litigation pending the outcome of the arbitration . . . simply as a means of controlling its docket." *Broussard v. First Tower Loan, LLC*, No. 15-1161 c/w 15-2500, 2016 WL 879995 at *5 (E.D. La. Mar. 8, 2016) (finding no basis for mandatory stay because arbitrable and non-arbitrable issues were not "inherently inseparable," but holding discretionary stay appropriate because "facts and claims significantly overlap" and allowing both actions to proceed would waste judicial and party resources and create risk of inconsistent judgments) (citations omitted). When, as here, "some of the parties are bound by arbitration and some are not, courts routinely stay all proceedings pending the resolution of the arbitration—particularly where the arbitrable and non-arbitrable claims arise out of the same set of facts." *Gem City Mgmt. Inc. v. Rinde,* No. 21-CV-7676 (RA), 2022 WL 4133429, at *6 (S.D.N.Y. Sept. 12, 2022) (citations omitted); *see also Old Republic Sur. Co. v. J. Cumby Constr., Inc.*, No. 1:21-CV-126-GHDDAS, 2022 WL 3438227, at *4 (N.D. Miss. Aug. 16, 2022).

This court agrees with defendants that, given the close relationship between the facts of the arbitrable and non-arbitrable claims, there is a real possibility that some sort of collateral estoppel might arise from the arbitration proceedings. While this court does not prejudge this issue, it does seem wise to allow the dust from the arbitration proceedings to settle and to thereupon allow each side to present their arguments regarding what effect, if any, those proceedings should have upon the remaining claims. Based on this conclusion, this court concludes that a discretionary stay would be in order even if the provisions of the FAA did not require it.[7]

In light of the foregoing, it is ordered that defendants' motion [21-1] to dismiss or, alternatively to compel arbitration, is granted in part and denied in part. Plaintiffs' motion for preliminary injunction [52-1] is dismissed as moot. This case is hereby stayed pending the completion of the arbitration proceedings as to the claims against defendant BAC.

This, the 26th day of December, 2023.


/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

---

[7] This court notes that, in their brief, defendants argue that plaintiff Corr lacks "standing" to assert its claims in this case since it was not a party to the Warranty agreement. This court is presently only concerned with jurisdictional and arbitration issues, and, when used in a jurisdictional sense, the term "standing" ordinarily refers to a case in which none of the plaintiffs has standing and which should accordingly be dismissed for lack of jurisdiction. That is clearly not the case here, however, and, as such, this court will leave a consideration of whether Corr asserts a proper claim for relief in the complaint for a later date.